ROBERT S. GERSTELL AND ALICE R. GERSTELL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4299–64. Filed May 4, 1966.

*David Sachs*, for the petitioners.
*Julius M. Jacobs*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the taxable year 1961 in the amount of $89,727.64. The issue is whether the petitioners are entitled to deduct, as a loss arising from theft, an amount of $103,836.98, being the difference between the amount received by them upon the sale of certain annuity contracts ($500) and the amount received by the purchaser upon surrender thereof shortly thereafter ($104,336.98).

FINDINGS OF FACT

Some of the facts have been stipulated and the stipulations are incorporated herein by this reference.

The petitioners are husband and wife residing in Easton, Pa. Their joint Federal income tax return for the calendar year 1961 was filed with the district director of internal revenue, Scranton, Pa. Petitioner Alice R. Gerstell is a party herein only by reason of having filed a joint return with her husband, Robert S. Gerstell, and the latter will hereinafter be referred to as the petitioner.

Petitioner is chairman of the board of directors of Alpha Portland Cement Co. He has been a member of such board since about 1918, and through the years has been a member of various committees, including the executive committee. He has occupied both the position of president and that of executive vice president of that company, and

held one or the other of those positions in the period 1952 to 1954. The petitioner has also been an officer and/or director of many other companies.

In 1952 E. L. Synnestvedt was a general insurance agent in Easton, Pa., and represented Republic National Life Insurance Co. of Dallas, Tex. (hereinafter referred to as the insurance company). In that year he advised Norman E. Ritter, a pension consultant, of a tax-saving plan which contemplated the purchase of annuity contracts from the insurance company under which the annuity payments would commence after expiration of a number of years; the prepayment by the purchaser of all the premiums at a discount by means of a loan obtained from the insurance company; the prepayment of the interest on such loan for a period of 1 or more years, with a consequent increase in the loan value of the annuity; the withdrawal by the purchaser of such increase in loan value; the deduction, for income tax purposes, of the interest so prepaid; and the subsequent sale to a third party of the annuity contracts (rather than the surrender of the annuity to the insurance company) in order to treat the gain as long-term capital gain. Ritter entered into an arrangement with Synnestvedt whereby he would sell, on a commission basis, annuities under such tax-saving plan. He was not an employee of Synnestvedt's general agency, nor was he a registered agent for the insurance company. Before the sale of each such contract Ritter would apply to the State of Pennsylvania for a license to effect such sale, after obtaining Synnestvedt's consent thereto. He sold this plan to five persons, including the petitioner.

In the latter part of 1952 Ritter called upon the petitioner and presented the plan to him, furnishing him with a brochure outlining the plan and containing schedules showing, on the basis of the maximum loan each year, the yearly interest payable (at 4 percent), the yearly increase in the cash surrender value of the annuity, the net cost of the loan interest after taking into account the tax saving resulting from the deduction of the interest by taxpayers in various tax brackets, and the "spendable balance" in the hands of the purchaser. Ritter also showed the petitioner copies of ruling letters issued by the respondent to other taxpayers approving the tax results sought to be achieved by the plan.

The petitioner submitted all the data in his possession to his attorney, Richard H. Appert, for an opinion and requested that Ritter discuss the matter with such attorney. Ritter had an extended conference with such attorney and explained the plan in detail, and furnished him a brochure and copies of the respondent's rulings. A further conference was held attended by the petitioner, his attorney, and Ritter at which the tax consequences of the plan were discussed. Petitioner was advised by his attorney that under the then-existing law, as indicated by letter rulings of the respondent, interest on the loan would

be deductible for Federal income tax purposes; that in the event the petitioner should discontinue the plan the insurance company would close out the contract and apply the cash surrender value to the payment of the loans; that for income tax purposes petitioner would be deemed to have received the full amount of the cash surrender value and that to the extent this exceeded the premium paid he would be deemed to have received ordinary income; that in such case the tax would be great enough to wipe out all the advantages of the previous interest deductions and would result in a net financial loss on the entire plan; [1] that it might be possible to avoid being taxed on ordinary income, if, instead of surrendering the contract, the petitioner sold it to a third party, who would then surrender it to the insurance company; that since there would always be a small equity over and above the amounts previously drawn out by the petitioner by way of loan, the contract could be sold at a price which would yield a small profit to the purchaser; but that there was the possibility that the respondent might treat the transaction as a surrender of the annuity by the petitioner, resulting in the receipt of ordinary income.

The petitioner, by application dated December 22, 1952, applied to the insurance company for the purchase of three annual premium-deferred annuity contracts (without life insurance) designating a different one of his three children as the annuitant in each of the contracts.

The petitioner issued a check dated December 23, 1952, in the amount of $20,000, payable to Synnestvedt, in payment of the first annual premium due on the three annuity contracts. The insurance company issued to the petitioner three annuity contracts providing for monthly

---

[1] The attorney submitted to the petitioner calculations of the amount of such financial loss assuming surrender at the end of the 4th, 8th, 12th, and 30th years. The calculations showed that such financial losses would be respectively $13,355, $29,718, $49,268, and $219,418. The calculation for surrender at the end of the 4th year (which is typical of the others) was as follows:

| | |
|---|---:|
| Cash surrender value applied to payment of loans | $533,786 |
| Premium paid | 493,710 |
| | |
| Taxable income on surrender | 40,076 |
| | |
| Additional tax to married man if $40,076 is added to income of $150,000 | 34,186 |
| | |
| Cash proceeds of loans retained | 60,076 |

| | | |
|---|---:|---:|
| Cash outlay: | | |
| Initial premium | $20,000 | |
| Interest for 4 years on loan | 82,077 | |
| | 102,077 | |
| Deduct: Tax saving on interest | 62,832 | 39,245 |
| | | |
| Net profit prior to surrender | | 20,831 |
| Tax on surrender | | 34,186 |
| | | |
| Net loss | | (13,355) |

annuity payments of approximately $2,014 to each of his children, commencing in December 1993. One of these contracts was issued as of December 20, 1952, and the other two were issued as of December 22, 1952. These contracts were identical in all material respects. Each provided that the petitioner reserved to himself all the incidents of ownership therein, and that in the event of the death of the annuitant before commencement of annuity payments a death benefit would be payable to the petitioner.

On December 30, 1952, the petitioner obtained from the Philadelphia National Bank a loan in the amount of $473,710 for which he gave his personal demand notes and for which he pledged as collateral security the three annuity contracts. This amount was not paid directly to the petitioner but was applied by the bank to the credit of the insurance company (which had an account in such bank) in full satisfaction and prepayment (on a discounted basis) of the remaining 40 annual premiums on the annuity contracts. Then the petitioner, in form, entered into certain transactions hereinafter described. On the same date the petitioner borrowed from the insurance company the maximum loan value of the annuity contracts resulting from his premium payments totaling $493,710 and prepaid the interest (in the amount of $84,994.84) for the succeeding 4 years on the amount so borrowed. After the prepayment of premiums and interest for 4 years the cash or loan value of the three annuities totaled $533,784.01. This amount was computed by the insurance company in accordance with the practice of determining the cash or loan value of the annuity contracts as of the date to which interest on outstanding loans had been prepaid. The petitioner then borrowed from the insurance company the full amount of the increase in the loan value resulting from such prepayment of interest. The total amount of $533,784.01 thus loaned to the petitioner was paid out by the insurance company in the form of a check for $474,078.45 made payable to the bank to cover the loan which petitioner had obtained from the bank earlier the same day and the bank's interest and clearance charges of $368.45, and a check made payable to petitioner for the balance of $59,705.56.

The petitioner signed, and Ritter witnessed, notes designated "Annuity Loan Agreement" for a total indebtedness of $533,784.01, which were attached to, and made parts of, the annuity contracts. By the annuity loan agreements the petitioner assigned to the insurance company as security the annuity contracts and the premiums paid thereunder, and it was provided that the indebtedness should be payable and enforceable solely out of such security. Each loan agreement contained the following provisions:

Interest is payable in advance for such periods of time, not less than one year, as may be agreed upon. If the loan is repaid in whole or in part, either in cash or by surrender of the contract, interest will be charged on the amount repaid

only to the date of repayment, and any excess paid will be applied to reduce the indebtedness or, if there be no further indebtedness, will be refunded.   In case of death of the annuitant, interest will be charged only to the date of approval of proofs of death, and any excess paid will be applied to reduce the indebtedness or, if there be no further indebtedness, will be refunded.

The various documents involved in the above-mentioned transactions were prepared by either the insurance company or Synnestvedt and were furnished to petitioner by Ritter.   There were also prepared by or on behalf of the insurance company statements containing a list of all the various documents so involved, together with an explanation thereof, and tables showing, as of the end of specified periods, the total cash value of the contracts, the net cash value, and the net death benefit, assuming that the outstanding indebtedness to the company would remain at the above figure of $533,784.01.   All these papers were forwarded by Bruce S. Cronlund, acting on behalf of his brother-in-law, Synnestvedt, to either the petitioner or to Ritter for the purpose of forwarding to the petitioner.

During 1953, petitioner issued to the insurance company his check, dated December 23, 1953, in the amount of $101,097.17, for which the insurance company issued receipts designating the amount as "Interest due on loan" and indicating that interest on the loan was paid to December 1960.   This prepayment increased the combined cash or loan value of the three annuity contracts by $56,041.99, as computed by the insurance company in accordance with tables contained in the contracts. Petitioner executed new annuity loan agreements totaling $589,826, furnished him by Ritter, and received from the insurance company its check in the amount of $56,041.99.

The petitioner prepared his own Federal income tax returns with the help of his secretary.   In his return for the taxable year 1952 he claimed as a deduction interest paid to the insurance company in the amount of $84,994.84, which reduced the tax liability, which would otherwise have been reported, by $65,255.78.[2]   In his Federal income tax return for the taxable year 1953 the petitioner claimed as a deduction interest paid to the insurance company in the amount of $101,-

---

[2] The net financial benefit to the petitioner based upon such a reduction in tax liability, would be $19,966.50, computed as follows :

Received by petitioner:

| | | |
|---|---|---|
| Insurance company loan | | $533,784.01 |
| Tax saving from interest deduction | | 65,255.78 |
| | | 599,039.79 |

Disbursed by petitioner :

| | | |
|---|---|---|
| First-year premium | $20,000.00 | |
| Next 40 years' premium prepayment | 473,710.00 | |
| Four years' interest prepayment | 84,994.84 | |
| Bank interest and charges | 368.45 | 579,073.29 |
| Net financial benefit | | 19,966.50 |

097.17, which resulted in a net tax reduction of $78,611.48.[3]   In August 1954 the petitioner's attorney, after inquiry by the petitioner, advised him that in his opinion any future interest payments to the insurance company would be deductible under the Internal Revenue Code of 1954.   In August 1954 petitioner also made inquiry of Cronlund who told him that in his opinion such interest payments would continue to be deductible.   At that time, at the request of the petitioner, Cronlund obtained computations of amounts necessary to prepay the interest for 4 and 5 years, and also the amounts of the corresponding increased loan values.   Cronlund received such information from the insurance company by letter dated September 7, 1954, which he forwarded to Ritter who delivered it to the petitioner.   In October 1954, further information in this regard was obtained by Cronlund at the request of the petitioner and was forwarded by Cronlund to Ritter who delivered the information to the petitioner.

In early December 1954, petitioner was advised by a friend that he should dispose of his annuity contracts as soon as possible because such friend had been informed by an insurance man that there was a possibility that new legislation might be enacted in the following year which would preclude the treatment of gain on the sale of such contracts as capital gain.   Thereupon petitioner telephoned Ritter and told him about the information he had received.   A meeting was arranged for the end of the first week in December 1954, which was attended by the petitioner, Ritter, and Roland Van Horn, an accountant who had advised Ritter with respect to the tax consequences of the transactions.   At such meeting Ritter told petitioner that Synnestvedt had given him information similar to that which petitioner had received from his friend with respect to the possibility of new legislation, that Synnestvedt told him he was advising his clients to dispose of their annuity contracts, that Synnestvedt had suggested that Ritter so advise his clients,[4] and that he, Ritter, agreed that it would be advisable for petitioner to sell his contracts.

At such meeting the parties discussed the manner of disposition of the annuity contracts.   Ritter stated that he had been told by Synnestvedt that he, Synnestvedt, had formed a corporation, Moylan Investment Corp. (hereinafter referred to as Moylan) which would purchase them.[5]   The petitioner asked Ritter what Moylan would pay for the annuity contracts.   Ritter told him that he did not know but would contact Synnestvedt and find out.   At such meeting the

[3] A computation similar to that in fn. 2 would show a net financial benefit to the petitioner in the amount of $33,556.30.

[4] In 1953 and 1954 Ritter was not actively engaged in the insurance business.   He was president of an electric sales company and devoted most of his time to such position.

[5] Moylan was organized in October 1953.   Synnestvedt, its president, owned 52 percent of its stock, his wife and son owned 32 percent, and Cronlund, its treasurer, owned 16 percent.   Ritter was not a shareholder, officer, or employee.   The petitioner was not related in any way to Moylan or its officers or stockholders.   Moylan was engaged in the business of purchasing various securities.

petitioner questioned Ritter about the value of the annuity contracts. Ritter stated that he did not know the value thereof, but that since petitioner had borrowed so much from the insurance company the value would be nominal if no additional interest payments were made. Petitioner asked Ritter to verify the surrender value of the contracts and Ritter told him he would see Synnestvedt and bring back the answer. At the same meeting Van Horn was asked to look over the annuity contracts to see whether he could determine what they were worth. He did so and stated that he thought the annuity contracts were worthless.

Thereafter Ritter contacted Synnestvedt and then telephoned the petitioner. He told the petitioner that he had been to Philadelphia and had seen Synnestvedt, that the contracts had only a nominal value, and that Synnestvedt would be willing to buy them for $500. The petitioner agreed to sell at that price and Ritter so informed Synnestvedt. In agreeing to sell the contracts for $500 the petitioner relied upon Ritter's statement that they had only a nominal value. The petitioner had not read the loan rules contained in the annuity loan agreements, and did not know that the annuity contracts had more than a nominal value. He thought that $500, plus a profit of about $1,000 for the purchaser, represented the value of the three contracts. Ritter and the petitioner arranged for a further meeting, which was held on December 16 or 17, 1954.

On December 13, 1954, Cronlund addressed a letter to Ritter, which Ritter transmitted to the petitioner, in which he stated that Synnestvedt had informed him that the petitioner was interested in "our" opinion regarding the status of the annuity loan plan under the 1954 Internal Revenue Code. In such letter Cronlund expressed the opinion that the petitioner could, before the end of the year, prepay interest for as many years as he wished (and thus increase his loans) and that such interest would be deductible for the year 1954. Therein he also stated that he understood that petitioner was seriously considering disposing of his contracts before the end of the year. In the letter Cronlund advised that upon the sale of the annuity contracts under existing law any gain would constitute capital gain, but that there was a strong indication that there would be further revisions of the Internal Revenue Code in the following year and that whether or not such favorable treatment could be obtained in any future years would depend upon the nature of such revisions. He further stated, in effect, that if the petitioner had decided to dispose of these contracts he might well conclude to do so in 1954 rather than risk the uncertainties incident to postponing action.

On December 14, 1954, petitioner telephoned his attorney and told him that there was some possibility that he might not be able to sell at a later date on a capital gains basis and that he was therefore con-

sidering selling his annuity contracts at that time for $500. The attorney cautioned petitioner about the gain he would have on the disposition of the annuity contracts and expressed concern as to whether a sale to a third party would result in capital gain, rather than ordinary income, particularly if the third party immediately surrendered the contracts.[6] The attorney told him that the gain which he had calculated was based upon the surrender of the contracts at the expiration of the period for which interest had been prepaid, that there would be a problem of valuation upon disposition at any time other than the time to which the interest payments had been made, and he suggested that the petitioner talk to Ritter about it. The petitioner did not ask his attorney's advice as to the surrender value of the annuity contracts or ask him to determine whether the amount of $500 was a proper price for them. The attorney did not know the cash surrender value of the contracts. He did not know that the petitioner had prepaid interest beyond December 1956.

On December 15, 1954, Cronlund sent Ritter a check in the amount of $500 drawn by Moylan in favor of the petitioner for the purchase of the petitioner's annuity contracts. Ritter also received from either Synnestvedt or Cronlund new annuity loan agreements dated December 16, 1954, for loans aggregating $651,057.99 for delivery to the petitioner. Ritter met with the petitioner on either December 16 or December 17, 1954, and delivered the $500 check to the petitioner, which petitioner deposited on December 17, 1954. Petitioner signed the new annuity loan agreements, his signature being witnessed by Ritter. Petitioner turned over to Ritter the annuity contracts and Ritter forwarded them, together with the new annuity loan agreements, to Synnestvedt.

The petitioner also drew his check (dated December 22, 1954) in favor of the insurance company in the amount of $118,865.26, which was received by Cronlund and which was transmitted by him, together with the new annuity loan agreements, to the insurance company on December 20, 1954. The amount of $118,865.26 represented the amount computed by the insurance company as representing an additional 4 years' prepayment of interest based upon the resultant maximum loan value of the contracts. However, the petitioner decided that he would borrow $1,500 less than the maximum loan value. Accordingly, the insurance company issued to the petitioner its check for a refund of $600.20 and issued receipts to the petitioner for a total of $118,265.06, which was designated as prepayment of loan interest to December 1964. This increased the combined cash or loan value

---

[6] By letter dated Dec. 17, 1954, the petitioner's attorney reiterated to petitioner his concern that a sale of the contracts to a third party might be regarded as a surrender of the contracts by him, but stated that the risk could be minimized if the petitioner could find a purchaser who was willing to retain the contracts for some period before surrendering them.

of the annuity contracts to $651,057.99, an increase of $61,231.99. Since the petitioner wanted to borrow $1,500 less than the full loan value, the insurance company issued its check to petitioner for $59,-731.99. Such check, the refund check, and the interest receipts were sent to Cronlund by the insurance company by letter dated December 22, 1954. Cronlund immediately forwarded the checks and the receipts to Ritter, who in turn transmitted them to the petitioner.

On December 23, 1954, Moylan executed three annuity loan agreements in the same amounts as those contained in the agreements dated December 16, 1954, which the petitioner had executed, and delivered them to the insurance company in replacement of such agreements previously executed by the petitioner.

On December 23, 1954, the petitioner wrote his attorney advising him that he had sold the annuity contracts to a third party, believing that he would "be able to get out on a Capital Gains basis"; that the purchaser "tells me he is willing to retain the contracts for some period before surrendering them"; and that prior to his sale of the contracts he had paid the interest for 4 additional years and would deduct the interest in his 1954 return.

On December 23, 1954, the petitioner wrote a letter to Cronlund in which he stated that he had recently sold the annuity contracts to Moylan; that in his opinion the risk that the Internal Revenue Service might successfully hold that in substance he had actually surrendered the contracts instead of making a sale thereof would be greatly minimized "if you would as the purchaser be willing to retain the annuity contract for a considerable period of time before surrendering it"; and that he had mentioned this circumstance to Ritter at the time of their discussion and that Ritter had told him he would endeavor to have this done. Therein he requested that Cronlund relieve his mind by advising of his concurrence.

On January 5, 1955, Moylan surrendered to the insurance company the annuity contracts which were transferred to it by the petitioner, and by reason of such surrender received from the insurance company on January 6, 1955, the sum of $104,336.98.[7] This amount was de-

[7] Moylan's check book indicates that it had purchased and surrendered these and other annuity contracts as follows:

| Date of check | Amount of check | Date of deposit of redemption proceeds | Proceeds of redemption |
|---|---|---|---|
| Oct. 26, 1953 | $3,600.00 | Oct. 26, 1953 | $4,390.66 |
| Jan. 27, 1954 | 3,500.00 | Jan. 26, 1954 | 4,358.24 |
| Do | 70.00 | | |
| Dec. 15, 1954 | 500.00 | Jan. 6, 1955 | 104,336.98 |
| Dec. 24, 1954 | 100.00 | Jan. 9, 1955 | 31,814.40 |
| Jan. 13, 1955 | 29,900.00 | | |
| Do | 1,000.00 | | |
| Dec. 1, 1955 | 100.00 | Jan. 5, 1956 | 27,573.09 |
| Jan. 6, 1956 | 26,473.09 | | |
| Nov. 7, 1956 | 8,046.00 | Nov. 7, 1956 | 8,346.06 |
| Nov. 21, 1956 | 15,997.00 | Nov. 14, 1956 | 16,697.04 |

termined and computed by the insurance company pursuant to the "loan rules" as set forth in the annuity loan agreements, as of the date of surrender of the annuity contracts.

On January 10, 1955, Moylan issued a check to Ritter in the amount of $52,618.49 for services in connection with the purchase of the petitioner's annuity contracts. Ritter used part of these proceeds to pay Van Horn for all of the work performed by him in connection with these annuity contracts from 1952 to 1954. Ritter did not inform petitioner that he had received this amount as a commission.

It was not until January 21, 1955, that Cronlund addressed a letter to petitioner in answer to petitioner's letter of December 23, 1954. Therein Cronlund made no response to petitioner's request that Moylan retain the contracts for a considerable period before surrender, merely stating that he was confident that the sale could not be "looked upon as constituting a surrender of the contracts on your part." He did not state therein that the contracts had been surrendered by Moylan on January 5, 1955.

All the transactions involved herein took place in Pennsylvania.

In his Federal income tax return for the taxable year 1954 petitioner claimed as a deduction interest paid to the insurance company in the amount of $118,865.26, which resulted in a net tax reduction of $91,687.64.[8] In his return for 1954 the petitioner did not report any gain from the sale of the annuity contracts or report as income the amount of $600.20 refunded to him by the insurance company.

The net financial benefit to the petitioner for the entire 3-year operation of the plan, based upon the tax reductions which would result from allowance of the claimed interest deductions, was $87,177.37. However, had the petitioner, consistently, reported for 1954 long-term capital gain of $156,347.99 [9] upon the sale of the annuity contracts, it would have increased his income tax liability for 1954 by $39,087 (being 25 percent of the gain of $156,347.99) which, in turn, would have converted the 1954 net financial benefit of $33,654.57 into a net financial loss of $5,432.43, and would have reduced the overall net financial benefit from the transactions to $48,090.37.

Upon audit of the petitioner's income tax returns for the taxable years 1952, 1953, and 1954 the respondent disallowed as deductions the amounts claimed as interest paid to the insurance company and such disallowances were upheld by this Court. *Robert S. Gerstell*,

---

[8] A computation similar to that in fn. 2 would show a net financial benefit to the petitioner in the amount of $33,654.57.

[9] Calculated as follows: Total realized on sale, $650,057.99 (consisting of $500 cash from Moylan plus assumption by Moylan of indebtedness of $649,557.99), less cost of annuity contracts of $493,710 (consisting of initial premium of $20,000 plus prepayment of remaining 40 installments of $473,710).

T.C. Memo. 1962–181, affd. (C.A. 3) 319 F. 2d 131, certiorari denied 375 U.S. 941.[10]

In connection with the preparation for trial of the above case, William Fallon, the attorney who was representing the respondent, instituted an investigation of the books and records of Moylan. On October 26, 1961, Fallon informed petitioner's attorney that Moylan's records showed that it had surrendered the annuity contracts for over $104,000, and the attorney so informed the petitioner. It was not until this time that the petitioner or his attorney learned of the amount for which the contracts had been surrendered by Moylan, and this was the first time the petitioner discovered that they could be surrendered for that amount. The petitioner then directed the attorney to take legal action for recovery. Such attorney, after research, thought that there would be a basis for recovery under Pennsylvania law except for the fact that the statute of limitations had run. He made a demand upon Ritter, Synnestvedt, and Moylan for recovery, and in response they called attention to the statute of limitations. No recovery was effected.

In his income tax return for the taxable year 1961 the petitioner claimed as a deduction an amount of $103,836.98 as a theft loss, with the following explanation: "Theft loss from fraud of Moylan Investment Corporation, Philadelphia, Pennsylvania, and others, in purchase from me for $500.00 of annuity policies worth $104,336.98. Sale occurred in December, 1954; fraud was discovered in October, 1961." In the notice of deficiency the respondent disallowed such claimed deduction, stating: "The deduction claimed for 'Theft Loss' has been disallowed because it has not been established that you sustained a theft loss in the amount of $103,836.96 or in any amount."

OPINION

Section 165 of the Internal Revenue Code of 1954 [11] provides for the deduction of losses arising from theft. The term "theft" as used in the Code is "a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false

---

[10] In that case we held, following *Knetsch* v. *U.S.*, 364 U.S. 361, that the transaction was a sham and that there was no indebtedness created or interest paid within the meaning of the Internal Revenue Code.

We also held that the taxpayer's out-of-pocket costs in the amount of $148,009.08 were not deductible as an expense under sec. 212 of the Internal Revenue Code of 1954 (and sec. 23(a)(2), I.R.C. 1939) or as a loss incurred in a transaction entered into for profit under sec. 165(f) of the Internal Revenue Code of 1954 (and sec. 23(e)(2), I.R.C. 1939).

In view of our holding that the claimed interest deductions were not allowable, we did not there reach the respondent's alternative contention that petitioner realized taxable income on the transfer of the annuity contracts in 1954.

[11] SEC. 165(a). GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) AMOUNT OF DEDUCTION.—For purposes of subsection (a), the basis for determining

pretenses, and any other form of guile." *Edwards* v. *Bromberg*, (C.A. 5) 232 F. 2d 107, and *Perry A. Nichols*, 43 T.C. 842 (appeal dismissed (C.A. 5)). See also sec. 1.165–8(d), Income Tax Regs. The parties are not at odds in this respect. Indeed, the respondent concedes on brief that losses sustained by reason of criminally false pretenses are deductible under section 165 of the Code. Whether a loss arises from theft depends upon the law of the jurisdiction where the loss was sustained. *Edwards* v. *Bromberg, supra*. And it has been held that a criminal conviction is not a necessary element in a taxpayer's proof that a theft loss has been sustained. *Michele Monteleone*, 34 T.C. 688, and *Paul C. F. Vietzke*, 37 T.C. 504.

It is the contention of the petitioner that he was induced to sell his annuity contracts worth $104,336.98 for $500 by fraudulent representations of the purchasers, that the fraudulent acquisition of the annuity contracts by the purchasers constituted a violation of the criminal laws of Pennsylvania, and that hence he sustained a theft loss of $103,836.98 within the meaning of the Internal Revenue Code.

The Pennsylvania Statutes, vol. 18, sec. 4836, provide:

### Cheating by fraudulent pretenses

Whoever, by any false pretense, obtains the signature of any person to any written instrument, or obtains from any other person any chattel, money, or valuable security, with intent to cheat and defraud any person of the same, or being an officer, manager, agent, employe of or in any way interested in any person, by false pretense, knowingly and with intent to defraud, procures, obtains, or aids, assists, or abets in obtaining from any other person, any chattels, moneys, or valuable securities for such person of which he is an officer, manager, agent, employe or in which he is in any way interested, is guilty of a felony, and on conviction, shall be sentenced to pay a fine not exceeding five thousand dollars ($5,000), or undergo imprisonment not exceeding five (5) years, or both.

It has been held by the courts of Pennsylvania that a criminal false pretense is "the false representation of an existing fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive, and does, in fact, deceive, and by means of which one person obtains value from another without compensation." *Commonwealth* v. *Evans*, 190 Pa. Super. 179, 154 A. 2d 57; and *Commonwealth* v. *Gross*, 161 Pa. Super. 613, 56 A. 2d 303.

It is the petitioner's contention that when he sold the annuity contracts in December 1954 he did not know that they had a value in

the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

\*     \*     \*     \*     \*     \*     \*

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. \* \* \*

\*     \*     \*     \*     \*     \*     \*

(e) THEFT LOSSES.—For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

excess of about $1,500, that Ritter falsely represented to him that they had only a nominal value, and that he relied upon such representation. The respondent on brief concedes that the contracts were worth about $104,000 after the 1954 prepayment of interest, but contends that Ritter did not know that they had more than a nominal value, that he merely expressed his opinion that they had a nominal value, and that hence there was no fraudulent misrepresentation of the value by Ritter. He also contends that the petitioner knew that the contracts had a value of more than $100,000 after the 1954 prepayment of interest and that therefore he did not rely upon any representation made by Ritter. The respondent argues that the petitioner intentionally disposed of the annuity contracts for the nominal amount of $500, for the purpose of attempting to assure treatment of the transaction as a sale resulting in long-term capital gain, rather than ordinary income which would result from a surrender of the contracts, since otherwise the tax benefit plan would result in a net financial loss to the petitioner instead of the intended net financial gain resulting primarily from the tax benefit derived from the claimed interest deductions.

The form of the transaction was a sale by the petitioner of the annuity contracts to Moylan, a corporation owned by Synnestvedt and his family, including his brother-in-law Cronlund. In the negotiations regarding the sale the petitioner dealt directly with Ritter. However, the record makes it clear that not only Ritter, but also Synnestvedt, the president of Moylan, and Cronlund, the treasurer of Moylan, were active in the transaction. We are satisfied that each of them knew the details of the proposed transaction, including the additional prepayment of interest by the petitioner. The precise relationship between Ritter and Moylan is not shown, but since Ritter received directly from Moylan a fee of $52,618.49 for his services in connection with the sale, we think it must be concluded that his services were rendered as an agent of that company.

The petitioner testified that at the first meeting he had with Ritter about the end of the first week of December 1954, he asked Ritter about the value of the contracts and that Ritter told him that he did not know the value, but that since petitioner had borrowed so much from the insurance company it was his opinion that the value was infinitesimal. Ritter testified that at such meeting he told the petitioner that he had no idea what the value of the contracts was but that if no additional interest payments were made the value would be nominal. The petitioner further testified that at such first meeting he asked Ritter to verify the surrender value of the contracts and that Ritter told him he would see Synnestvedt and bring back the answer. He further testified that subsequently, but before he agreed to sell the contracts, Ritter told him that he had been to Philadelphia and had seen Syn-

nestvedt, that the contracts had only a nominal value, and that Synnestvedt would be willing to buy them for $500. Ritter testified that what he told petitioner was that Synnestvedt said that Moylan was willing to pay $500 for the contracts.

We believe, and have found as facts, that at the first meeting Ritter stated that he would see Synnestvedt and verify the surrender value of the contracts and that he later told the petitioner that he had seen Synnestvedt, and that the contracts had only a nominal value. It must be presumed that Synnestvedt, who was general agent of the insurance company which issued these contracts, was aware of their surrender value. Moreover, his corporation, Moylan, had acquired and surrendered other annuity contracts, and in connection therewith he surely would have acquired knowledge of their value. And since Cronlund was the treasurer of Moylan, we must conclude that he also knew that the contracts had a substantial surrender value. Ritter testified that he had not read all the provisions of the annuity contracts and the annuity loan agreements and that he did not know that the contracts had any more than a nominal value. He said that he told the petitioner that if no additional interest payments were made the value of the contracts would be nominal. He, of course, was in a position to know that interest had already been prepaid up to December 1960. He witnessed the petitioner's signature to the loan agreements executed in 1952 evidencing prepayment of interest until December 1956, and he furnished the petitioner with the annuity loan agreements in 1953 evidencing prepayment of interest until December 1960. Furthermore, he also furnished the petitioner with the new annuity loan agreements executed in 1954 evidencing prepayment of interest to December 1964 and witnessed the petitioner's signature thereto.

These facts and others, including the fact that he was paid a commission of over $52,000 in connection with the sale, raise a serious question regarding Ritter's claim that he did not know that the contracts had more than a nominal value. However, we find it unnecessary to determine whether he was aware of the fact that the contracts had substantial value. Under all the circumstances, we think the conclusion is inescapable that one or more of the individuals representing Moylan, by false pretense, knowingly and with intent to defraud, obtained, or assisted in obtaining from the petitioner the annuity contracts for Moylan at a fraction of their value, in violation of section 4836, *supra*. In this connection we note that over the period from October 1953 to November 1956, Moylan acquired and surrendered a number of annuity contracts, but that in each instance it derived only a small profit, except with respect to the annuity contracts which it obtained from the petitioner.

We are also satisfied that the petitioner did not know that the contracts had more than a nominal value. He so testified and we

have so found as a fact. From his testimony it appears that he was under the impression that if the full loan value was withdrawn at the time of each prepayment of interest the contracts would have only a nominal value. It is true that had he carefully read the loan rules he would have been aware that upon surrender of the contracts prior to the date to which interest had been prepaid the unearned interest would be applied against the indebtedness and the excess refunded to him. However, he testified that he had not read these rules, and that he relied upon the representation made by Ritter that the contracts had only a nominal value. He stated that he would not have parted with the contracts for $500 had he known their value. We think it not unreasonable to conclude that the petitioner would rely upon the statement made by Ritter who had originally sold him the contracts, particularly since Ritter represented to him that he had consulted Synnestvedt, the general agent of the insurance company. In any event, it has been held by the courts of Pennsylvania that where the pretense is such as might well mislead the confiding and unwary a fraud ought not to be ignored because care and circumspection were not exercised by the person imposed on. See *Commonwealth* v. *Johnson*, 312 Pa. 140, 167 A. 344, and cases cited therein.

We have not overlooked the fact that the petitioner's attorney had mentioned to the petitioner that there would be a valuation problem in the event of a surrender of the contracts prior to the date to which interest had been prepaid, but we are satisfied that the petitioner did not understand that in such case the contracts would have any substantial value. He did not ask his attorney's advice as to the surrender value of the contracts or ask him to determine whether the amount of $500 was a proper price for them.

In view of the foregoing, it is our conclusion that the petitioner sustained a loss arising from theft in the amount of $103,836.98. The respondent makes no contention that this amount exceeds the basis of the contracts. Since the record establishes that such loss was discovered by the petitioner in the taxable year 1961, at which time the statute of limitations barred recovery,[12] he is entitled to deduct such loss for that year.

*Decision will be entered under Rule 50.*

---

[12] Action must be brought within 6 years after the date of the fraudulent act. See 12 Pa. Stat., sec. 31, and *Turtzo* v. *Boyer,* 370 Pa. 526, 88 A. 2d 884. We also note that criminal prosecution for fraud must be brought within 2 years after the commission of the crime. 19 Pa. Stat., sec. 211.