ALFREDO V. YATES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Yates v. Commissioner
Docket No. 17093-86.
United States Tax Court
T.C. Memo 1988-565; 1988 Tax Ct. Memo LEXIS 594; 56 T.C.M. (CCH) 844; T.C.M. (RIA) 88565; December 13, 1988. *594 Held, on the facts, petitioner is not entitled to a theft loss deduction for 1983. Alfredo V. Yates, pro se. Elizabeth P. Flores, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Chief Judge: Respondent determined a deficiency of $ 2,919 in petitioner's income tax for the year 1983. The sole issue for decision is whether petitioner is entitled to a theft loss deduction under section 165. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in New York, New York, at the time his petition herein was filed. In 1983 petitioner worked as a police officer in the personnel division of the New York City Police Department. Petitioner's responsibilities in personnel included interviewing, hiring *596 and correspondence work. In addition to his work as a police officer, petitioner taught self-defense courses at a local YMCA. In 1983 he reported income of $ 30,321 on his income tax return. He also claimed a $ 15,000 theft loss deduction which, after reduction by the statutory formula under section 165(h)(1), resulted in an $ 11,868 deduction. [2] Petitioner alleged that a professional con artist lured him into surrendering $ 15,000 in cash with false promises of profits from overseas investments in natural gas. In an attempt to substantiate his claimed theft loss, petitioner produced savings passbooks and a cancelled check, drawn on an account in petitioner's name. Three of the savings passbooks indicate that on September 19, 1980, petitioner withdrew the following amounts from term accounts and incurred the listed penalties for early withdrawal: Bank
Withdrawal
Penalty
Brooklyn Savings Bank
$ 1,186.86
$  87.38
Brooklyn Savings Bank
1,219.73
107.00
(acct: "IN TRUST FOR ANTHONY K. YATES")
Eastern Savings Bank
2,428.15
203.90
(acct: "ITF ANTHONY YATES (SON)")
On October 13, 1980, almost one month after withdrawing *597 the above amounts, petitioner withdrew from one of his bank accounts an additional $ 3,500 by cashing one of his own personal checks made out to "cash" at a Citibank branch in the Bronx. A fourth savings passbook indicates that in the following spring, on May 29, 1981, petitioner withdrew $ 960.38 from a Dollar Savings Bank account reading "In Trust For Derrick Yates" and incurred a penalty of $ 74.69 in so doing. On August 2, 1983, petitioner filed a police report which stated that he had been the victim of grand larceny in the amount of $ 15,000. The police closed the file on petitioner's grand larceny complaint on the same day it was filed. OPINION Petitioner's claimed theft loss is the sole issue in dispute. Petitioner alleges that he was swindled out of $ 15,000, which amount he concludes is deductible as a theft loss under section 165. In opposition, respondent contends that petitioner does not merit a deduction for the alleged theft loss because he has failed to substantiate the loss. We agree with respondent. Respondent's determination in the statutory notice of deficiency is presumptively correct and petitioner bears the burden of proving otherwise. Rule 142(a). *598 We further note that petitioner bears the burden of proving by a preponderance of the evidence that a theft actually occurred. Rule 142(a). Petitioner has failed to meet this burden. To carry his burden of proof, petitioner must establish the following three elements of theft loss under section 165, [3] namely -- (1) that a theft has occurred under the laws of the jurisdiction wherein the alleged loss took place. Monteleone v. Commissioner,34 T.C. 688, 692 (1960); Muncie v. Commissioner,18 T.C. 849, 851 (1952); (2) the amount of the theft loss. Gerstell v. Commissioner,46 T.C. 161, 175 (1966); section 1.165-8(c), Income Tax Regs.; and (3) the date of discovery of the loss. McKinley v. Commissioner,34 T.C. 59, 63 (1960); section 165(e); section 1.165-8(a), Income Tax Regs.
*599 For reasons set out below, the Court does not reach the issue of when petitioner discovered his alleged theft loss in this case. Petitioner must prove that a theft occurred under New York law, as the first leg of his argument under section 165. New York's penal code categorizes the theft alleged by petitioner as larceny by false pretenses. Petitioner's police report specified the alleged crime as grand larceny. Under section 155.35 of N.Y. Penal Law (McKinney 1983), the alleged crime could be categorized as grand larceny in the second degree. However, for purposes of our analysis theft in the form of the lesser offense of larceny by false pretenses will suffice. N.Y. Penal Law section 155.05 (McKinney 1983). The elements of larceny by false pretenses under New York law are: (1) an intent to deprive an owner of property, (2) the making of a false representation, (3) knowledge of the representation's falsity, (4) obtaining the owner's property and (5) inducing the owner to give up his property in reliance upon the false representation. People v. Chaitin,94 A.D.2d 705, 462 N.Y.S.2d 61 (2d Dept. 1983), affd. 61 N.Y.2d 683, 472 N.Y.S.2d 597, 460 N.E.2d 1082 (1984). *600 For purposes of section 165(c)(3), this Court has adopted the broad definition of theft announced by the Fifth Circuit in Edwards v. Bromberg,232 F.2d 107, 111 (5th Cir. 1956), as "covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile." Paine v. Commissioner,63 T.C. 736, 741 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975). Petitioner has failed to persuade us that he was the victim of a theft under any definition. The record is composed of petitioner's testimony, certain of petitioner's savings passbooks, one of petitioner's cancelled checks and petitioner's police report. Neither the savings passbooks nor the cancelled check, made out to cash, are sufficient standing alone to prove to what use petitioner put his funds. Similarly, petitioner's police report merely echoes his testimony. As we have found as a fact, the reported case was filed three years after its alleged discovery and closed by the police department without further action on the same date the report was filed. In our judgment, *601 petitioner filed the report for the sole purpose of buttressing his tax case and for no other purpose. By failing to produce corroborating evidence of a theft, petitioner has attempted to sustain his burden of proof solely on the basis of his own testimony. Unfortunately for petitioner, his testimony lacks credibility. It is well established that we do not have to accept petitioner's uncontroverted and uncorroborated testimony on its face. We are free to disregard petitioner's testimony based upon contradicting facts, omissions in his testimony, his manner during testimony, his sincerity or lack thereof and inherent improbabilities in his statements. Kean v. Commissioner,51 T.C. 337 (1968), affd. in part, revd. in part on other grounds 469 F.2d 1183, 1188 (9th Cir. 1972). Our conclusion that we must discount much of petitioner's testimony is based upon petitioner's evasive, ambiguous and vague portrayal of events. Petitioner's testimony may be outlined as follows: In 1980 petitioner met a professional con man named Dr. Wali Shariff (Shariff) at the YMCA where petitioner taught self-defense. After hearing that Shariff was "an investor in precious *602 metals" and observing Shariff's carriage, conduct and impressive three piece suits, at the YMCA, petitioner came to the conclusion that Shariff was a successful American businessman. Over time, petitioner's confidence in Shariff was established and Shariff informed petitioner "that he [Shariff] was working with various countries in helping to build natural gas." Shariff offered petitioner the opportunity to share in the natural gas boom by earning commissions for securing investors from the V.I.P. area of the YMCA. Petitioner's sales efforts met with no success and he received no commissions. During this time, petitioner inquired about Shariff's reputation at the YMCA. The YMCA beauty salon operator informed petitioner that Shariff was "a good person" who had supposedly handled investments for Muhammad Ali and other professional boxers in the past. Petitioner testified that he did not ask for and was unaware of Shariff's work or home addresses or phone numbers. Petitioner reached Shariff through a telephone answering service and Shariff returned petitioner's calls. In 1980 Shariff showed petitioner documents adorned "with seals and stuff on them, stamps from the United Nations *603 and everything, heads of state and what not." After seeing these documents, petitioner was convinced that Shariff's natural gas deal was legitimate. Shariff invited petitioner "to come down to the United Nations to meet with some heads of state," but petitioner refrained as he reasoned Shariff was "handling that aspect" of investing petitioner's $ 15,000 with "heads of state" at the United Nations. Petitioner testified that in exchange for petitioner's cash Shariff promised a handsome return that "was supposed to be like 50 percent and it was supposed to come, like, maybe within that year or a year." After petitioner gave Shariff the $ 15,000, he testified that he continued to talk with him on the phone. Petitioner would call Shariff's professional answering service "periodically" and Shariff would return petitioner's call. Finally, petitioner told Shariff, "Listen, you are playing me for a fool." Petitioner testified, "But it was unpleasant. I never -- he never called back and after that I left messages on the answering service and he never returned the calls after that. And I never saw him again." Our observation of petitioner's manner in testifying persuades us that he *604 was a man of sophistication and "street savvy" who had benefited from his experience as a police officer in the Bronx, and was not a person easily taken in by a con man over an extensive period of time, as petitioner would have us believe. His testimony does not convince us that petitioner gave his life savings to a complete stranger. Petitioner allowed the alleged crime to go unreported for over a year until, he stated, a woman at an I.R.S. office advised him to file a complaint with the police. Petitioner testified that the reason why he did not file a complaint earlier was that "I was bickering, you know, bickering." With "myself and guys I would ask in the street whether they saw this guy [Shariff], would they see him, you know." We assume that petitioner, as a police officer, was aware of the importance of filing a complaint as soon as he discovered his cash had supposedly vanished with Shariff. We interpret petitioner's testimony to mean that he would in all likelihood never have filed a police complaint unless prompted to do so by someone at the I.R.S. Furthermore, whether or not petitioner was out of pocket for whatever reason, he has failed to prove the amount. The *605 passbooks produced at trial reveal that petitioner withdrew $ 5,795.12 from four savings accounts, three of which were trust accounts for his sons Anthony and Derrick. Petitioner testified that he also borrowed some money from his mother, although he was unable to recall the amount. Petitioner alleges that he then gave the total unspecified amount of bank withdrawals and borrowed cash to Shariff. Petitioner further testified that the only record of this transaction is to be found in the savings passbooks. Petitioner was unable to recall the date, time, place or other details of the transfer of his life savings. On October 13, 1980, petitioner cashed a check for $ 3,500 at a Citibank branch in the Bronx. He testified that Shariff accompanied him to the bank and that he gave Shariff the full $ 3,500, in cash. Although petitioner could neither recall the places at which the alleged cash transfers occurred nor the dates of transfer, he had no difficulty in recalling that his additional cash payments to Shariff equaled the exact amount of $ 5,704.88, which allowed petitioner to arrive at his total claimed theft loss of $ 15,000. Petitioner testified that the reason he paid Shariff *606 in cash and not in check was that he believed payment by check "would have created problems of transferring the money and losses incurred from transfer and that would affect the profits made. And as a result investors would not get as much as they were going to get because of the extra payments they would have to have." We are not persuaded by the logic of this rationalization. We are also troubled by petitioner's inability to explain why he did not request or receive receipts of any type. We believe that as a police officer who daily worked in the personnel division of the police department, he was familiar with records, files, and the customary paperwork associated with this kind of job, and that petitioner recognized the importance and significance of records and receipts. Yet petitioner testified that he gave his life savings to a virtual stranger without asking for a receipt of any type. The only alleged written record of Shariff's existence and petitioner's involvement with him were "three to four post cards" from London, Paris and Sierra Leone advising that Shariff was "just dropping you a line, Al [petitioner]. Business is going well. See you when we get back to *607 New York." Unfortunately, to petitioner's knowledge Shariff never returned from his trip to Sierra Leone, and petitioner threw the post cards into an incinerator after becoming "mad" one day. In conclusion, we hold that petitioner has failed to establish either the amount by which he was allegedly swindled or that the series of events as he has portrayed them actually occurred. Consequently, petitioner is not entitled to the theft loss deduction as claimed, and we so hold. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to sections of the Internal Revenue Code as in effect during 1983. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. See n.3, infra.↩
3. As in effect for 1983, section 165 stated in pertinent part: (a) GENERAL RULE. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) AMOUNT OF DEDUCTION. -- For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) LIMITATION ON LOSSES OF INDIVIDUALS. -- In the case of an individual, the deduction under subsection (a) shall be limited to -- * * * (3) except as provided in subsection (h), losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * * (e) THEFT LOSSES. -- For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. * * * (h) CASUALTY AND THEFT LOSSES. -- (1) GENERAL RULE. -- Any loss of an individual described in subsection (c)(3) shall be allowed for any taxable year only to the extent that -- (A) the amount of loss to such individual arising from each casualty, or from each theft, exceeds $ 100, and (B) the aggregate amount of all such losses sustained by such individual during the taxable year (determined after application of subparagraph (A)) exceeds 10 percent of the adjusted gross income of the individual.↩