ESTATE OF E. E. DE ROSSETT, DECEASED, AND ESTATE OF JULIA DE ROSSETT, DECEASED, RALPH W. BRITE, EXECUTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
ESTATE OF DE ROSSETT v. COMMISSIONER
Docket No. 2743-73.
United States Tax Court
T.C. Memo 1975-123; 1975 Tax Ct. Memo LEXIS 252; 34 T.C.M. (CCH) 590; T.C.M. (RIA) 750123; May 5, 1975, Filed Ralph W. Brite, for the petitioners. Daniel A. Taylor, Jr., and William T. Overton, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following deficiencies in the Federal income tax of petitioners: 1968
$13,071
1969
6,048
We are to decide whether the De Rossetts were entitled to a theft loss deduction of $20,000 for 1968 and a bad debt deduction of $10,829.50 for that same year; and whether certain deductions [1] were properly *253 claimed in connection with the maintenance and operation of a hunting range leased to E. E. De Rossett. FINDINGS OF FACT Certain facts have been stipulated and are found as stipulated. E. E. De Rossett (Ernest) and Julia De Rossett (Julia), husband and wife, filed joint Federal income tax returns for the years 1968 and 1969 with the district director of internal revenue, Austin, Texas. Ernest died on December 24, 1971, and Julia on May 9, 1972. Ralph W. Brite (Brite) was appointed executor of Ernest's estate on January 10, 1972, and of Julia's estate on May 23, 1972. He was a resident of San Antonio, Texas, when the petition herein was filed. In 1933 Ernest became acquainted with Curtis L. Hall (Hall); and in 1945 they entered upon their first *254 common venture: a truck business operated by Hall in Waco, Texas, under the name "Curtis Hall Truck Company, Inc." (the Truck Company). [2] Operation of that enterprise was terminated in 1955; and subsequently Hall established himself as a real estate dealer in Corpus Christi, Texas. Early in 1960 Hall was approached by Lin Holmes (Holmes) and Robert Reagor (Reagor) with a proposal to invest in undeveloped land in the vicinity of Manaus, Brazil. Hall introduced Reagor to Ernest who became interested in the proposal. Ernest decided to advance $15,000 to Hall, with which the latter might visit Manaus, investigate the avenues of investment available, and make any purchase of realty that appeared advisable. It was agreed that once Ernest had recovered his initial investment, he was to share the profits of the venture with Hall, Holmes, Reagor and Sol Levy, an advertising agent from Houston, Texas, who agreed to promote the sale of lots in any tract that might be purchased. Before departing for Brazil, Hall requested and received *255 from Ernest an additional $5,000 with which Hall's family and business were to be sustained during his absence. The additional advance was to be repaid in the event the land venture proved profitable. Upon his arrival in Manaus, Hall was introduced by Holmes (who had accompanied him to Brazil), to several Brazilians who claimed to be interested in the land venture. They suggested that a tract accessible to the proposed Manaus-Itacoatiara highway be acquired for development. The tract, about 10,000 hectares [3] in area, consisted of two adjacent lots. The smaller of the lots, located to the south of the other, measured 50 hectares and had direct access to the proposed highway. Having inspected the tract, Hall purchased it for about $8,000 on August 20, 1960. [4] After his return to Corpus Christi he received by mail a certificate of title, the pertinent parts of which are set forth in translation below: DEFINITE TITLE Of Unretractable Sale (Law 89, of December 31, 1959) THE GOVERNOR OF THE STATE OF AMAZOMAS, makes it known to whomsoever sees this Title, that it has been approved, the measurement and demarcation made by the professional *256 OSACKI SOARES, in the lot of land of no name, situated in the municipality of Manaus, at the request of CURTIS LEO HALL. The first lot of land is situated on the road from Manaus to Itacoatiara, Kilometer 56, with a total area of 500,000.00 square meters, with a perimeter of 3,000.00 three thousand linear meters, bounded on the North by land purchased by you, by a straight line of 500.00 linear meters, running 9 degree 30 minutes N.E. (M2-M3); bounded on the West by undeveloped lands by a straight line of 1,000.00 one thousand linear meters running 70 degree 30 minutes S.W. (M3-M4); bounded on the South by the Kilometer 56 of the road from Manaus to Itacoatiara on which it fronts, running 9 degree 30 minutes S.E. (M4-M1); bounded on the East by undeveloped lands, by a straight line of 1,000.00 one thousand linear meters, running 70 degree 30 minutes N.E. (M1-M2). The lot of land referred to measures at the front, in a straight line, 500.00 five hundred linear meters-----The second with a total area of 99,950,000.00 square meters, with a perimeter of 39,900.00 linear meters; bounded on the North with undeveloped lands by a straight line of 9,950.00 linear meters running 9 degree *257 30 minutes N.W. (M3-M4);-----on the West by undeveloped lands, by a straight line of 10,000.00 linear meters running 70 degree 30 minutes S.W. (M4-M1); on the South with land purchased by you, by a straight line of 9,950.00 linear meters running 9 degree 30 minutes S.E. (M1-M2); at the East with undeveloped lands by a straight line of 10,000.00 linear meters 70 degree 30 minutes N.E. (M2-M3). [Emphasis added.] By virtue of what has passed, this DEFINITE TITLE of Unretractable Sale, the above mentioned CURTIS LEO HALL will be invested all benefits and rights given by law, and subject to the dispositions consigned in the laws and regulations now in effect, as well as exempting the rights of third parties, without onus to the State. Palace of the Government of the State of Amazonas in Manaus
Signed by Gilberto Mestrinho de Medeiro Raposo [reverse side] No. 15152 Page 192v Protocal No. 1-C Presented on the 23rd day of Aug., 1960 (Off. sig.) Registered on page 198 of book #12 Div. of Alienation of Lands Manaus, 24th of Aug., 1960 Registered in Book 3-2 No. 3 12 132 and 12 133 Page 244 Manaus, 23rd of August, 1960 (Off. sig.) *258 For reasons that need not be recounted, development of the land did not proceed as had been planned. On May 14, 1968, an article appeared in the Corpus Christi Times in which were described the losses incurred by Americans who had been fraudulently induced to invest in cheap land in the interior of Brazil. The appearance of this article led Ernest to conclude that Hall had not obtained good title to the land purchased on August 20, 1960. He therefore claimed a deduction of $20,000 for 1968. [5]
*259 Wholly apart from the Brazilian land venture, Ernest advanced funds to Hall, or on his behalf, on several occasions in the period 1955-1963 as follows: Date
Explanation
Amount
1. 1955
Ernest discharged an obligation
$ 2,229.50
to Bexar County National Bank, in-
curred by Curtis Hall in connec-
tion with the liquidation of the
trucking business.
2. 11/11/59
Funds were advanced to Curtis
3,000.00
Hall so that he could discharge
outstanding obligations of the
trucking business (evidenced by
note).
3. Circa
Funds were advanced to Curtis
2,000.00
1959
Hall, their repayment being
conditioned on the sale of cer-
tain property that had been used
in connection with the trucking
business (evidenced by note). [6]
4. 5/8/62
Advance to Curtis Hall
600.00
5. 3/19/62
Advance to Curtis Hall
500.00
6. 1/1963
Advance to Curtis Hall
2,500.00
[7] $10,829.50
*260 During and subsequent to the period when the aforesaid advances were made, Hall was often in difficult financial straits. Aware of this situation, Ernest did not demand repayment of the advances and in 1968 they were still outstanding. [8]
Late in 1968 Hall, then about 60 years of age, suffered a serious decline in his health and, with it, a further weakening of his financial position. On the return for 1968, Ernest claimed a deduction in the amount of the advances. On July 1, 1960, Ernest leased a hunting range from W. H. George (George) for a period of 10 years. In consideration of the lease, Ernest agreed to pay an annual rental of $1,400; to spend no less than $30,000 over the term of the lease in making improvements to the premises; and to construct a dwelling on the property at a cost of at least $10,000. Among those whom Ernest entertained at the hunting range [9] were customers of a welding supply business which he had operated as a sole proprietorship in San Antonio for many years. On July 28, 1968, the welding supply business was incorporated *261 under the name "Alamo Welding Supply Co." [10] (the Welding Company). On August 29, 1968, the Welding Company became an electing small business corporation within the provisions of subchapter S; [11] and it filed a U.S. small business corporation income tax return with the district director of internal revenue, Austin, Texas, for the period August 1, 1968, to July 29, 1969. On June 30, 1969, the Welding Company sold a substantial part of its assets to William R. Rockwood (Rockwood) and on July 29, 1969, was dissolved. In conjunction with the sale, the Welding Company and the De Rossetts agreed *262 not to compete with the welding supply business in the area which the Welding Company had serviced, for a period of 10 years. In consideration of this covenant not to compete, Rockwood agreed to pay the De Rossetts $13,000 annually [12] during its term. Ernest agreed to lease to Rockwood the premises on which the welding supply business had been conducted for a term of 5 years at a monthly rental of $2,500, and also to lease him certain equipment which had been used in connection with the business for a term of 10 years at a minimum monthly rental of $333.33. In 1969 Ernest incurred expenses of $6,377 in connection with the operation and use of the hunting range. This amount was claimed as a deduction by the De Rossetts on their joint Federal income tax return filed for 1969. Also claimed as a deduction was $9,018 for depreciation on the improvements which Ernest had made to the hunting range pursuant to his lease. The annual rental for 1969 was paid by the Welding Company and claimed as a deduction on the U.S. small business income tax return filed for the company's fiscal year ended July 29, 1969. Statutory notice of the deficiencies *263 at issue herein was dated January 18, 1973. OPINION Ernest advanced $20,000 to Hall in connection with the Brazilian land venture. These funds were used to purchase undeveloped lands in the vicinity of Manaus and to defray expenses incidental to that acquisition. Petitioners claim the entire amount as a theft loss deduction for 1968. The advance of the $20,000 constituted an investment; for Ernest contemplated a return of these funds only in the event the land venture proved profitable. Joseph W. Hambuechen,43 T.C. 90 (1964). Where a taxpayer has been induced to make an investment by a misrepresentation which constitutes criminal conduct, any loss sustained by reason of that investment will be deductible in the year the taxpayer discovers he has been defrauded.[13]Edwards v. Bromberg,232 F.2d 107 (C.A. 5, 1956) Robert S. Gerstell,46 T.C. 161 (1966). Petitioners are not entitled to such a deduction in this instance; for they have not established, as a threshold matter, the amount of the loss which Ernest might have sustained on the venture. Lester I. Paine, 63 T.C. (Mar. 31, 1975). *264 Petitioners have attempted to show that Hall did not acquire the larger of the two lots for which he bargained. In support of this contention they have introduced into evidence the certificate issued by the Brazilian registrar in 1973. 13A The certificate, however, purports to attest only to the ownership of the smaller lot, not to that of the larger. Insofar as the certificate refers to the larger lot, it describes it as "lands owned by the applicant [Hall]." On the strength of such evidence, we are unable to ascertain the size of the tract that Hall acquired and, therefore, the amount of the loss, if any, that Ernest may have sustained on the transaction of August 20, 1960. Petitioners claim a deduction for 1968 in the amount of $10,829.50 under section 166(d)(1). [14]
*265 In support of this claim they must prove initially that Ernest made the advances under consideration with the intention that they be repaid. [15]Transamerica Insurance Company v. E. C. Womack, Inc., an unreported case ( E.D. Va. 1972, 31 A.F.T.R.2d 73-471, 73-1U.S.T.C. [*] 9146), affd. without published opinion 492 F.2d 1240 (C.A. 4, 1974). When he made the advances, Ernest was aware that Hall's financial position was weak. Respondent therefore contends that in making the advances, Ernest did not expect them to be repaid; that they were in substance gifts. We do not agree; for Ernest's relationship with Hall was not of a kind that might have occasioned acts of disinterested generosity on the scale in question. This, considered in conjunction with the entries in Ernest's books of account *266 and the promissory notes executed by Hall, suffices to convince us that the third [16] through sixth advances and one-half of the first and second advances were loans. We extend this holding only to one-half of the first two advances because these advances were intended to defray expenses incurred in connection with an enterprise in which the De Rossetts had an interest equal to that of the Halls. In support of their claim to a deduction under section 166(d)(1) (which can in no event exceed $8,214.75) petitioners must further prove that owing to an identifiable event occurring in 1968, any reasonable possibility of reimbursement was effectively foreclosed by the end of that year. James A. Messer Co.,57 T.C. 848 (1972)
In 1968 Hall's health deteriorated sharply. Given his age and his already weak financial position, the onset of serious illness, in our judgment, rendered his obligations to Ernest worthless within the intendment of section 166(d)(1). We therefore hold that petitioners are entitled to claim a deduction under that *267 section for 1968 in the amount of $8,214.75. On the U.S. small business income tax return filed on behalf of the Welding Company for the year ended July 29, 1969, there was included among the advertising expenses deducted $1,400 paid to George as rent for the hunting range. On their joint return for 1969 the De Rossetts deducted $6,377 in expenses incurred in connection with the operation of the hunting range as well as depreciation of $9,018 on the improvements which Ernest had made on it. Respondent would disallow the $1,400 and $6,377 items in their entirety and one-half of the $9,018 item. Petitioners contend that the aforesaid amounts are fully deductible as the hunting range was maintained to entertain customers of the welding supply business. The realty which Ernest leased from George was a facility used in connection with entertainment within the intendment of section 274. [17] Section 274 would permit deductions for items such as those under consideration, i.e., rent, depreciation and operating expenses, [18] only if petitioners were to demonstrate that the facility was used primarily in furtherance of the welding supply business. [19]
*268 In their attempt to sustain their burden of proof, petitioners are at once at a decided disadvantage due to the fact that documentary evidence as to who made use of the facility in 1969 is almost wholly lacking. Petitioners have tried to fill this evidentiary lacuna with the testimony of Herbert Hyman. [20] We find this testimony inadequate, however, to substantiate petitioners' claim if for no other reason than that Hyman was not present on each occasion in 1969 when the facility was in use. Had it been demonstrated to our satisfaction that the facility was used primarily to entertain customers of the welding supply business, petitioners would have further had to prove that the items sought to be deducted were directly related to the active conduct of the business. [21] This would require a demonstration that while entertaining customers at the hunting range Ernest actually engaged with them in the transaction of business. [22] There is nothing in the record to indicate that he did so. Accordingly, respondent must be held to have prevailed in respect of this issue. *269 Decision will be entered under Rule 155.
Footnotes
1. One of the deductions, $1,400 in amount, was claimed by the E. E. De Rossett Company, an electing small business corporation within the meaning of sec. 1371 etseq.,↩ I.R.C. 1954, as amended, of which E. E. De Rossett was the sole shareholder, in respect of its taxable year ended July 29, 1969. The others, $4,509 and $6,377, were claimed by E. E. and Julia De Rossett on their joint Federal income tax return filed for 1969.
2. Stock in the Truck Company was owned by the following parties: ↩
E. E. and Julia De Rossett
49%
Hall and his wife
49%
Employees
2%
3. One hectare equals 2.47 acres.↩
4. While in Brazil, Hall incurred an additional $8,000 of expenses incidental to the purchase. The balance of the $20,000 which had been advanced to him by Ernest was used in connection with his Corpus Christi real estate business.↩
5. In preparing for this litigation, Brite contacted attorneys in Brazil in an effort to ascertain the validity of Hall's title. In 1973 the attorneys procured a certificate from the real estate registrar's office in Manaus, the pertinent parts of which are set forth in translation below: [It is certified] at the verbal request of interested party that on pages two hundred and forty-four (244) of Book three-J (3-J) on the date of August twenty-third (23) of nineteen hundred and sixty (1960), there was annotated under order number twelve thousand one hundred and thirty-two, the purchase of the lot of land situated at kilometer 56 of the Manaus - Itacoatiara Highway in the name of CURTIS LEO HALL * * * pursuant final Deed of irrevocable sale dated August 20, 1960 and signed by the Governor of the State, Dr. Gilberto Mestrinho. The property has the following characteristics and measurements. PLOT OF LAND situated at kilometer 56 of Manaus-Itacoatiara highway with total area of 500,000.00 square meters with a perimeter of 3,000.00 three thousand linear meters bound on the North by a straight line of 500.00 linear meters headed 9 degree.30 minutes NE (M2-M3) with lands owned by the applicant↩ and to the West by a straight line of 1,000.00 one thousand linear meters headed 70 degree 30 minutes NE (M1-M2) by Government unoccupied land. Facing a straight line the mentioned plot of land measures 500.00 five hundred linear meters. CONDITIONS OF CONTRACT: The purchaser is entitled to all privileges and rights conferred by law and subject to the rules governed by the Laws and Regulations in force as well as having to safeguard third parties' rights without any charge to the State. - Law: 89-31-12-59. [Emphasis added.]
6. Circa 1960 this property was traded for a piece of real estate in Corpus Christi which was sold shortly after it was acquired. ↩
7. On his books, Ernest carried as receivables the advances numbered 1, 2 and 4 and, to the extent of $1,600, the advance numbered 3.↩
8. Aside from such amounts as Hall may have owed Ernest, several unsecured obligations were outstanding against him in 1968.↩
9. A guest book was kept as a record of the use of the hunting range. Entries are numerous for each of the years 1961 through 1970, save 1969. Among those whom the De Rossetts entertained at the facility on certain of the occasions when it was in use was Herbert Hyman, a rancher from San Antonio and patron of the welding supply business. ↩
10. The name of the corporation was later changed to "E. E. De Rossett Company." ↩
11. Secs. 1371 etseq., I.R.C. 1954, as amended. All statutory reference herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
12. This obligation was unsecured.↩
13. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * * * (e) Theft Losses.--For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.↩
13A. See footnote 5 supra.↩
14. SEC. 166. BAD DEBTS. (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- * * * * * (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.↩
15. If Hall incurred conditional obligations to repay the advances when they first were made, petitioners can prevail on this issue only to the extent the obligations matured into absolute liabilities. United States v. Virgin,230 F.2d 880 (C.A. 5, 1956); Zimmerman v. United States,318 F.2d 611↩ (C.A. 9, 1963).
16. Though conditional when first incurred, the obligation to repay the third advance matured into an absolute liability circa 1960.↩
17. See sec. 1.274-2(e)(2)(i), Income Tax Regs.↩
18. See sec. 1.274-2(e)(3)(i), Income Tax Regs.↩
19. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (a) Entertainment, Amusement, or Recreation.-- (1) In General.--No deduction otherwise allowable under this chapter shall be allowed for any item-- * * * * * (B) Facility.--With respect to a facility used in connection with [entertainment, amusement or recreation], unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deduction shall in no event exceed the portion of such item directly related to * * * the active conduct of the taxpayer's trade or business.↩
20. See sec. 1.274-5(c)(6)(iii), Income Tax Regs.↩
21. See footnote 19, supra; see also sec. 1.274-2(a)(2), Income Tax Regs.↩
22. See sec. 1.274-2(c)(3)(ii) and (iii); see also Rev. Rul. 63-144, 1963-2 C.B. 129↩, 132-136.